UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
LAFAYETTE DIVISION

CHRISTINA NYDEGGER,           )
                              )
            Plaintiff         )
                              )
     vs.                      )   CAUSE NO. 4:09-CV-57 RM
                              )
MICHAEL J. ASTRUE,            )
COMMISSIONER OF SOCIAL        )
SECURITY,                     )
                              )
            Defendant         )

## OPINION AND ORDER

Christina Nydegger seeks judicial review of the final decision of the Commissioner of Social Security denying her applications for disability insurance benefits (DIB) and supplemental security income (SSI) under Title II and XVI of the Social Security Act, 42 U.S.C. §§ 423 and 1382. The court has jurisdiction over this action pursuant to 42 U.S.C. § 405(g) and 1383(c)(3). For the reasons that follow, the court affirms the Commissioner's decision.

### Background

Ms. Nydegger alleged disability as of April 1, 1982 due to hearing loss in her right ear, depression, and a learning disability. Her claims were denied initially, on reconsideration, and following an administrative hearing in March 2009, at which she was represented by counsel.

In determining disability, the ALJ considered the documentary evidence presented at that hearing and the testimony offered by Ms. Nydegger, medical

experts Dr. Julian Freeman and Jack Thomas, Ph.D., and vocational expert Robert Barber, and applied the agency's five-step sequential evaluation, 20 C.F.R. §§ 404.1520 and 416.920. The ALJ found that Ms. Nydegger had physical and mental impairments that were severe (arthritis and torn meniscus in the right knee, obesity, and anxiety disorder); that her impairments, alone or in combination, didn't meet or equal the severity of any of the impairments listed in 20 C.F.R. Pt. 404, Subpt. P., Appendix 1 (specifically Sections 1.00Q, 1.02A, 12.05 and 12.06); that Ms. Nydegger had the residual functional capacity to do a limited range of sedentary work involving simple repetitive tasks; and that while she didn't have any past relevant work that constituted substantial gainful activity, Ms. Nydegger could perform other work that existed in significant numbers in the national economy, including work as a general office clerk and surveillance monitor. The ALJ therefore concluded that Ms. Nydegger wasn't disabled at any time through the date of decision, March 31, 2009, and wasn't entitled to either DIB or SSI.

The Appeals Council denied Ms. Nydegger's request for review, making the ALJ's decision the final decision of the Commissioner of Social Security. O'Connor-Spinner v. Astrue, 627 F.3d 614, 618 (7th Cir. 2010); Liskowitz v. Astrue, 559 F.3d 736, 739 (7th Cir. 2009). This appeal followed.

STANDARD OF REVIEW

The issue before the court isn't whether Ms. Nydegger is disabled, but whether substantial evidence supports the ALJ's decision. Cass v. Shalala, 8 F.3d 552, 555 (7th Cir. 1993). If it does, the court must affirm the Commissioner's decision. Clifford v. Apfel, 227 F.3d 863, 869 (7th Cir. 2000). The substantial evidence standard prevents the court from "reconsidering facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility" — in short, substituting its own judgment for that of the Commissioner, Williams v. Apfel, 179 F.3d 1066, 1071-1072 (7th Cir. 1999); *accord* Powers v. Apfel, 207 F.3d 431, 434-435 (7th Cir. 2000) — and requires "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971); *see also* Overman v. Astrue, 546 F.3d 456, (7th Cir. 2008); Jens v. Barnhart, 347 F.3d 209, 212 (7th Cir. 2003).

DISCUSSION

Ms. Nydegger challenges the ALJ's findings at steps two, three, and five of disability evaluation, contending that the ALJ erred in finding that her hearing loss wasn't severe, that her mental impairments didn't meet the requirements of Listing 12.05, and that substantial evidence didn't support the ALJ's findings with respect to credibility, residual functional capacity, and the type of work she could perform. While acknowledging that some of the vocational expert's testimony might not have been consistent with the Dictionary of Occupational Titles, the

Commissioner contends that any error was harmless and that the ALJ's decision was supported by the evidence and the law and should be affirmed.

## A. Severity of Impairments

Ms. Nydegger contends that the ALJ erred at steps two and three of the disability evaluation when he found that her hearing loss wasn't severe, that she had surgery to correct her knee problem, and that her mental impairments didn't meet the criteria for Listing 12.05.

Dr. Thomas Brennan found on January 19, 2006, that Ms. Nydegger had total hearing loss on the right side, with good hearing on the left side, and that "this type of hearing loss is likely to be lifelong." But when he examined Ms. Nydegger again in July 2007, Dr. Brennan found that she had only "a mild loss" on the right side. The ALJ noted that another of Ms. Nydegger's examining physicians, Dr. Jesse Li, found that her hearing was normal in January 2006. The ALJ concluded that Dr. Brennan's more recent report was persuasive, and that Ms. Nydegger's hearing impairment wasn't severe. The medical evidence supports that determination, and the court can't reweigh that evidence or substitute its own judgment for that of the ALJ. Williams v. Apfel, 179 F.3d at 1071-1072; *accord* Powers v. Apfel, 207 F.3d at 434-435.

Ms. Nydegger also contends that the ALJ incorrectly concluded that she had surgery to correct her knee problem when no medical records show that she actually had the surgery. Ms. Nydegger doesn't indicate why such an error would warrant remand.

4

The ALJ noted that a St. Elizabeth Hospital surgical history and physical report seemed "to reflect that the claimant did undergo arthroscopic knee surgery on October 17, 2007, although the actual surgical report [was] not reflected therein," and that the record contained no further records of knee complaints or treatment. The ALJ concluded that this evidence "would permit a reasonable inference that she did, indeed, undergo a successful knee surgery," but deferred to the medical expert's testimony, which was based on a presumption that Ms. Nydegger hadn't undergone surgery, in deciding whether Ms. Nydegger's knee impairment limited her functional capacity.

The ALJ's decision states in relevant part:

> . . . [A]t the hearing Dr. Freeman, the internal medical expert, testified the claimant's obesity and right knee problem, in combination, would significantly limit her ability to lift, stand, walk, perform postural maneuvers, or work at heights. Of note, *the medical expert based his conclusion on a presumption that the claimant had not undergone knee surgery*, as reflected in the claimant's testimony. However, as previously noted, a surgical history report did suggest [Ms. Nydegger] underwent arthroscopic knee surgery in October 2007, although the actual operation report for this was not in the file. Even assuming the claimant did undergo knee surgery, *I will nevertheless defer to the medical expert's testimony* regarding the claimant's physical functional limitations, since the claimant's residuals of arthritis and her post-surgical status, in combination with her morbid obesity, still would prudently limit her physical activities to a quite significant degree.

Ms. Nydegger's argument that her mental impairment met the requirements of Listing 12.05(C), and that the ALJ erred in failing to consider that subsection, is legally and factually unsupported. The ALJ found that while Ms. Nydegger suffered from a severe anxiety disorder, the diagnoses of mild mental retardation

5

weren't supported by substantial evidence in the record and didn't satisfy the criteria for Listing 12.05. The ALJ found that Ms. Nydegger's intellectual and memory functioning, while reduced, were not seriously impaired, as shown by her previous statements and statements made by her husband and sister, the testimony of the medical expert, Dr. Jack Thomas, and the state agency psychologist's assessment of mental residual functional capacity and psychological technique, notwithstanding the IQ scores obtained in 2005.

Ms. Nydegger contends that there was substantial evidence in the record to show that she suffered from mild mental retardation, and that "[t]he medical expert's 'guess' as to what the cause of [her] low IQ scores is not a sufficient legal reason to justify the ALJ's decision to adopt the medical expert's opinion." The issue, however, isn't whether there was evidence in the record that Ms. Nydegger might be disabled, but whether substantial evidence supports the ALJ's decision that she was not. Cass v. Shalala, 8 F.3d 552, 555 (7th Cir. 1993).

Presented with conflicting medical opinions from non-treating sources, the ALJ discussed each of those opinions in detail, and articulated his reasons for giving greater weight to Dr. Thomas's testimony. The law required nothing more.

Two psychologists — David Jarmon, Ph.D., in September 2005 and June 2006, and James Ascough, Ph.D., in July 2007 — evaluated Ms. Nydegger. Dr. Jarmon administered the Wechsler Adult Intelligence Scale-Third Edition (WAIS-III) during the 2005 evaluation and reported that Ms. Nydegger obtained a verbal IQ of 63, a performance IQ of 74, and a full scale IQ of 65. Based on those scores

and their clinical interviews, Dr. Jarmon and Dr. Ascough both opined that Ms. Nydegger suffered from anxiety disorder, mild mental retardation, obesity, unemployment and financial problems.

When Dr. Jarmon evaluated Ms. Nydegger again in June 2006, he administered the Wechsler Memory Scale-Third Edition (WMS-III). Dr. Jarmon reported that Ms. Nydegger's scores generally fell within the average range of functioning, except for a working memory socre of 79, which fell in the borderline range. He concluded that "the results of the current evaluation [were] primarily in the average range" and "appear[ed] to be [a] reasonably accurate reflection of current level of functioning," but opined that "the results of the earlier evaluation from September of 2005 appear[ed] to be more relevant," without stating why. His diagnoses remained the same (anxiety disorder, mild mental retardation, obesity, and financial limitations due to unemployment).

Neurologist Jesse Li examined Ms. Nydegger in January 2006, and opined that she suffered from mild to moderate mental retardation, the etiology of which was uncertain. Dr. Li's opinion appears to have been based on the mistaken belief that Dr. Jarmon's neuropsychology testing in September 2005 showed that the patient's verbal IQ was 53, performance IQ was 74, and full scale IQ was 55 — scores significantly lower than those actually obtained.

Jack Thomas, a psychologist and the medical expert at the March 2009 hearing, reviewed the medical evidence and agreed with Dr. Jarmon's and Dr. Ascough's primary diagnosis of anxiety disorder, but found that the evidence of

actual mental retardation was contradicted by the absence of marked problems with activities of daily living, communication, and socialization learning, and by Ms. Nydegger's scores on the WMS-III, which were all average except the working memory score. Dr. Thomas testified that the working memory score suggested a person who is likely to score lower on tasks that require sustained attention and concentration likely because of chronic anxiety, and opined that the reason Ms. Nydegger's scores were suppressed had to do with some anxiety during the IQ exam. He testified that Ms. Nydegger's working memory score was suppressed one standard deviation, "meaning that although she likely has intelligence in the average range, she's reduced to the borderline range . . . which means she's reduced to simple repetitive tasks." Dr. Thomas also testified that test results in Ms. Nydegger's school records indicated that her reading score was in the low average range, her language score was in the average range, and her math score was in the range of mental retardation, and opined that she had a learning disability in math. He ruled out any tasks requiring calculation or a greater than average production rate.

The ALJ noted that the state agency psychologists also had decided that Ms. Nydegger could perform simple repetitive tasks, and gave greater weight to Dr. Thomas's medical opinions. The ALJ concluded that Ms. Nydegger's level of intellectual functioning, though somewhat reduced, remained significantly greater than what might reasonably be expected from a mentally deficient individual, and that she could perform no more than simple, repetitive work that required no

8

more than one or two steps and didn't require any calculation tasks or greater than average speed or production. The ALJ's findings are consistent with and supported by Dr. Thomas's testimony and the state agency psychologist's assessment of mental residual functional capacity, and, as previously noted, the court can't reweigh the medical evidence of substitute its judgment for that of the ALJ.

Ms. Nydegger's assertion that her mental impairment met the requirements of Listing 12.05, is without merit. 20 C.F.R. Pt. 404, Subpt. P., Appendix 1, Listing 12.05, the listing for mental retardation, provides in relevant part:

> Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning *initially manifested during the developmental period*; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
> The required level of severity for this disorder is met when the requiremetns in A, B, C, or D are satisfied.
> ***
> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function....(Emphasis added).

State agency psychologist Joseph Pressner found in his March 24, 2006 assessment of Ms. Nydegger's mental residual functional capacity that mental retardation was diagnosed after age 22, that her mental impairment didn't satisfy the listing criteria, and that she wasn't disabled at any time through March 31, 2004 (the date she was last insured for DIB). The ALJ gave the state agency psychologists' opinion substantial weight, noting that they were "highly qualified

9

physicians who are experts in the evaluation of the medical issues in disability claims," and Ms. Nydegger doesn't challenge that finding on appeal.

The record shows that Ms. Nydegger had IQ scores in the 60 through 70 range, but those scores were obtained in testing in 2005, when Ms. Nydegger was 40 years old, and don't establish onset of mental retardation before age 22. The only IQ score in the record obtained during the developmental years was documented in November 1972 by Ms. Nydegger's first grade teacher, and showed a PMA IQ of 72.

### B. Credibility

Ms. Nydegger contends that the ALJ's assessments of her credibility, residual functional capacity, and ability to perform work as a general office clerk and surveillance monitor weren't supported by the evidence.

An ALJ's credibility determination is accorded great deference, and can't be overturned unless it is patently wrong. Sims v. Barnhart, 442 F.3d 536, 537 (7th Cir. 2006); Zurawski v. Halter, 245 881, 887 (7th Cir. 2001); Powers v. Apfel, 207 F.3d 431, 435 (7th Cir. 2000). In determining credibility, the ALJ is to consider:

> the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and other relevant evidence in the case record.

Arnold v. Barnhart, 473 F.3d 816, 823 (7th Cir. 2007) (quoting Social Security Ruling 96-7p).

Ms. Nydegger contends that the ALJ improperly discredited her testimony based solely on a September 2005 report from "a treating physician (whose signature is illegible)," which her attorney couldn't identify. The court reads the record differently.

The September 2005 opinion to which Ms. Nydegger refers was but one of several factors the ALJ considered in determining credibility. The ALJ also considered the objective clinical findings, subjective symptoms, prior statements by Ms. Nydegger, her husband, and sister, response to treatment, and level of function, and found that Ms. Nydegger's allegations of debilitating, disabling symptoms, serious functional limitations, and the substantially restricted activities of daily living to which she testified weren't consistent with or supported by the evidence, and so her testimony wasn't entirely credible. Substantial evidence in the record supports that determination.

### C. *Step Five*

The burden at step 5 of the disability evaluation is on the Commissioner to show that the claimant can perform other work that "exists in significant numbers in the national economy." 20 C.F.R. 404.1560(c)(2); *see also* <u>Overman v. Astrue</u>, 546 F.3d at 464; <u>Britton v. Astrue</u>, 521 F.3d 799, 803 (7th Cir. 2008). The Commissioner can meet that burden by relying on information contained in the *Dictionary of Occupational Titles* (DOT), SSR 00-4p; 20 C.F.R. §§ 404.1566(d)(1) and 416.966(d)(1), or on a vocational expert's tesimony. 20 C.F.R. §§ 404.1566(e)

and 416.966(e). Under SSR 00-4p, the ALJ must ask whether the vocational expert's testimony "conflicts with information provided in the DOT" before he relying on that testimony to support a disability determination. <u>Overman v. Astrue</u>, 546 F.3d at 463; <u>Prochaska v. Barnhart</u>, 454 F.3d 731, 735 (7th Cir. 2006). If there is an *apparent* conflict between the vocational expert's testimony and the DOT, SSR 00-4p requires the ALJ to inquire further and obtain a reasonable explanation for the conflict. SSR 00-4p; <u>Overman v. Astrue</u>, 546 F.3d at 463.

The ALJ accepted the medical experts' (Dr. Freeman and Dr. Thomas) testimony at the hearing with respect to residual functional capacity, and found that Ms. Nydegger retained the ability to:

* lift, carry, push and pull up to ten pounds occasionally an five pounds frequently;

* sit for up to eight hours total in an eight-hour work day;

* stand-walk in combination for up to two hours in an eight-hour work day;

* occasionally balance, bend, stoop, kneel, and crawl;

* rarely climb ramps or stairs;

* precluded from climbing ladders, ropes, or scaffolds or working at unprotected heights; and

* perform no more than simple, repetitive work that required no more than one or two steps, and did not require any calculation tasks or greater than average speed or production.

Ms. Nydegger contends that the ALJ didn't consider the effect of stress/anxiety and Dr. Thomas's testimony that she could perform only "a reduced range of very simple work that did not require high levels of production or any calculations." She also contends that Dr. Thomas's testimony that she was able to perform tasks at an average pace was inconsistent with "established limitations on a lower stress tolerance, memory function, and IQ." The record doesn't support Ms. Nydegger's arguments.

The ALJ relied on Dr. Thomas's testimony when he found that Ms. Nydegger had a severe anxiety disorder that didn't meet or equal the requirements of Listing 12.06 (anxiety-related disorders), and that she retained the mental residual fucntional capacity to perform no more than simple, repetitive work that required no more than one or two steps and didn't require any calculation tasks or greater than average speed or production.

Dr. Thomas testified that Ms. Nydegger's primary diagnosis was anxiety disorder, and that while she likely had intelligence in the average range, she was reduced to the borderline range due to anxiety. According to Dr. Thomas, that meant she was reduced to simple repetitive tasks, that didn't require calculations. On cross-examination, Dr. Thomas testified that "if [Ms. Nydegger] was asked to do tasks that require greater than average speed or greater than average production . . . those things would obviously increase her anxiety. . . . And so I would say that . . . definitely simple repetitive, definitely no greater than average production rate that could interfere with her level of anxiety." The ALJ's residual

functional capacity findings are consistent with Dr. Thomas's testimony at the hearing, and as already discussed, his assessment of the medical evidence was well supported.

When the ALJ asked the vocational expert what type of work, if any, was available given the restrictions listed above, the vocational expert stated that "it would be sedentary," with a "significantly low" general education development, "plus no production work, no calculating," which would include work as a general office clerk (1,214 jobs) and surveillance monitor (360 jobs). The vocational expert testified that the job of general office clerk was "sedentary unskilled" and "requir[ed] a minimum of a first grade math aptitude and a fourth grade language aptitude," and that "surveillance monitor require[d] a minimum of first grade math and seventh grade language." When the ALJ asked if his testimony was consistent with the DOT, the vocational expert answered yes. On cross-examination, Ms. Nydegger's attorney asked numerous questions about the number of steps involved in those jobs (*i.e.*, whether they were "simple one and two-step jobs"), but didn't ask the ALJ to identify which sections or titles of the DOT he was referring to, or ask any questions about the physical requirements listed in the DOT. Based on the vocational expert's testimony, and considering Ms. Nydegger's age, education, work experience and residual functional capacity, the ALJ found that Ms. Nydegger was capable of making a successful adjustment to other work that existed in significant numbers in the national economy, including general office clerk and surveillance monitor, and so was not disabled.

Ms. Nydegger now contends that the ALJ erred in relying on the vocational expert's testimony about the type of work she could perform because his testimony was inconsistent with the DOT's definition of "general office clerk." The Commissioner appears to concede in his response that the vocational expert's testimony might not have been entirely consistent with the DOT. Still, the Commissioner maintains that the ALJ was entitled to rely on the expert's testimony because the conflict wasn't apparent, as shown by Ms. Nydegger's attorney's not having challenged the vocational expert's testimony during the hearing or notifying the ALJ of a possible conflict, and Ms. Nydegger hasn't demonstrated that it was "obvious enough that the ALJ should have picked up on [it] without any assistance." Terry v. Astrue, 580 F.3d 471 (7th Cir. 2009). The Commissioner notes that the vocational expert didn't provide a specific DOT reference number for the "general office clerk" job at the hearing, and could have been referring to a job as a "preparer, microfilmer," DOT § 249.587-018 (4th ed. 1991), which involves document preparation at an unskilled level, and was within Ms. Nydegger's functional limits. Alternatively, he contends that any error in the vocational expert's testimony was harmless because the ALJ also found that there were a significant number of surveillance jobs in the region that Ms. Nydegger could perform, and Ms. Nydegger hasn't demonstrated that she was incapable of performing that job.

The ALJ satisfied the first step of the inquiry under SSR 00-4p when he asked the vocational expert whether his testimony was consistent with the DOT,

and the vocational expert testified that it was, but his duty to inquiry didn't necessarily stop there. If conflicts or inconsistencies between the vocational expert's testimony and the DOT were apparent, the ALJ had to resolve those conflicts before he could reasonably relying on that evidence to support a finding of no disability, even if the claimant's attorney didn't notify the ALJ of a possible conflict at the hearing. SSR 00-4p; Overman v. Astrue, 546 F.3d at 463 ("a claimant's failure to raise a possible violation of SSR 00-4p at the administrative level does not forfeit the right to argue later that a violation occured"); Prochaska v. Barnhart, 454 F.3d at 735. As the Overman court noted, "[T]he failure of [claimant's] counsel to identify the conflicts at the time of the hearing is not without consequence." Overman v. Astrue, 546 F.3d at 463. Ms. Nydegger now has to show that the conflict was "obvious enough that the ALJ should have picked up on [it] without any assistance." Terry v. Astrue, 580 F.3d at 478 (quoting Overman v. Astrue, 546 F.3d at 463. A review of the hearing transcript shows that she hasn't met that burden.

Ms. Nydegger says the conflict should have been apparent from Dr. Thomas's testimony regarding Ms. Nydegger's former employment as a cashier, and a comparison of the DOT's description of cashier (DOT § 211.462-014) and general office clerk (DOT § 209.562-010). Ms. Nydegger reasons that because Dr. Thomas testified that he had "no idea how it was possible for [Ms. Nydegger] to do a cashier's job," which has an SVP (Special Vocational Preparation) of 3 (indicating

16

semi-skilled work), she would have also been precluded from performing work as a general office clerk, which also has an SVP of 3.

Ms. Nydegger's reasoning would require the court to find that the ALJ knew or should have known how the DOT defined the job of cashier, which sections of the DOT the vocational expert was referring to during his testimony, and what the specific physical and mental requirements were for each of those jobs. Such an inference isn't reasonable given the evidence before the ALJ.

No one at the hearing asked the vocational expert to identify the sections or titles of the DOT to which he was referring, and he didn't provide any citations during his testimony. Ms. Nydegger's attorney had the opportunity to cross-examine the vocational expert about the consistency of his testimony with the DOT, but didn't do so. Nothing in the vocational expert's testimony, Dr. Thomas's testimony, or Ms. Nydegger's cross-examination, would have alerted the ALJ to a possible discrepancy between the expert's testimony and the DOT. Ms. Nydegger's educational background and cognitive abilities appear to match the requirements of both the general office clerk and surveillance monitor jobs. Under the circumstances, the court can't find that the conflict between the vocational expert's testimony and the DOT was so obvious that the ALJ should have picked up on it without assistance. *See* Hofer v. Astrue, 588 F.Supp.2d 952 (W.D. Wis. 2008). While it "would be helpful if administrative law judges required vocational experts to support their testimony with specific citations to the *Dictionary*, SSR 00-4p does not require administrative law judges to take that step." Hofer v. Astrue,

17

588 F.Supp.2d 952 (W.D. Wis. 2008). Accordingly, the court finds that the ALJ's determination at step five of the disability determination was supported by substantial evidence and the law.

The Commissioner maintains that even if the court found error, it would have been harmless because the ALJ found that there was at least one other job that was consistent with the DOT and Ms. Nydegger's residual functional capacity — that of a surveillance monitor — and that there were a significant number of those jobs available in the regional economy. *Citing* Liskowitz v. Astrue, 559 F.3d 736, 743 (7th Cir. 2009) ("As few as 174 jobs has been held to be significant . . ."). The court agrees. As was true in Hofer, this "does not appear to be a case in which a miscarriage of justice will result if the vocational expert's testimony is allowed to stand." Hofer v. Astrue, 588 F.Supp.2d at 967.

CONCLUSION

For the foregoing reasons, the court AFFIRMS the decision of the Commissioner of Social Security.

SO ORDERED.

ENTERED:   March 30, 2011

   /s/ Robert L. Miller, Jr.   
Judge  
United States District Court
